AMERICAN GRAPHOPHONE CO. v. LEEDS & CATLIN CO. et al.

(Circuit Court of Appeals, Second Circuit. April 31, 1909.)

No. 181.

1. PATENTS (§ 30*)—INVENTION—ANTICIPATION.

In contemplation of law an invention does not exist until the inventor's ideas have been reduced to practical form, either as the basis for a patent or an anticipation of another's invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 34; Dec. Dig. § 30.*]

2. PATENTS (§ 69*)—ANTICIPATION.

The naked assertion that a certain result has been accomplished, without describing the means which produced it, is insufficient as an anticipation.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 84; Dec. Dig. § 69.*]

3. PATENTS (§ 328*)—ANTICIPATION AND INFRINGEMENT—PROCESS OF MAKING COMMERCIAL SOUND-RECORDS.

The Jones patent No. 688,739, for a process of producing commercial sound-records, was not anticipated by the Adams-Randall British patent No. 9,996 of 1888, and is valid. Also held infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the Southern District of New York.

On appeal by the complainant from a decree dismissing the bill which alleges infringement of letters patent No. 688,739 granted to J. W. Jones for an improved production of sound-records.

See, also, 140 Fed. 981; 155 Fed. 427; 170 Fed. 332.

Philip Mauro, C. A. L. Massie, and Ralph L. Scott, for appellant. Louis Hicks, for appellees.

Waldo G. Morse, as amicus curiæ on behalf of defendants similarly situated.

Before COXE, WARD, and NOYES, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

COXE, Circuit Judge. The Jones patent relates to the commercial production of sound-records from an original record characterized by lateral undulations of substantially uniform depth. The inventor avoids the difficulties existing prior to the date of his invention by producing in the first instance a fully finished original record whose grooves are of the final depth required; thus doing away with the necessity for etching and subsequent smoothing. The original records made by this process are electroplated and the electroplate matrix is used as a die.

In carrying out the invention the inventor employs a disk of suitable recording material upon the surface of which he forms a spiral groove of practically uniform depth, containing lateral sinuosities or irregularities corresponding to the sound waves recorded. The copy to be used for reproducing is an exact copy of the record so formed which is complete and finished, its grooves being in slight but appreciable depth requiring no deepening or retouching by an etching fluid or otherwise. The original record is prepared for receiving the electroplate deposit by coating its surface with an electric conducting medium and is then placed in an electroplating bath and a layer of metal is deposited thereon. The thin matrix thus formed is readily separated from the original record which may be used repeatedly to form other matrices. The completed matrix which is reinforced by a supporting plate constitutes a die, the record appearing upon it in the form of a raised ridge, being the exact counterpart of the original sound groove. The die is then pressed into a disk of suitable material to receive and retain an accurate impression of the record on the face of the die. The stamped record thus produced is the finished commercial article, being a faithful copy of the original path traced by the recording stylus. The invention is limited to sound-records characterized by lateral undulations of practically uniform depth and is not claimed in connection with sound-records having vertical irregularities.

The claims are as follows:

"(1) The herein-described method of producing sound-records, which consists in cutting or engraving upon a tablet of suitable material, by means of the lateral vibrations of a suitable stylus, a record-groove of appreciable and practically uniform depth and having lateral undulations corresponding to the sound-waves, next coating the same with a conducting material, then forming a matrix thereon by electrolysis, and finally separating this matrix and pressing the same into a tablet of suitable material, substantially as described.

"(2) The process of producing commercial sound-records of the type indicated, which consists of first preparing a flat tablet or disk of soft waxlike material, then engraving thereon by means of the lateral vibrations of a suitable stylus a record-groove of appreciable and uniform depth and having lateral undulations, corresponding to sound-waves, next rendering the surface thereof electrically conductive, then forming a matrix thereon by electrolysis, next separating the matrix from the original record-disk without the use of heat, and finally impressing said matrix into a disk of suitable material to form the ultimate record, substantially as described."

The process of the invention is sufficiently disclosed by the claims and is as follows:

First. Engraving upon a tablet of soft waxlike material by means of lateral vibrations a record-groove of uniform depth and having lateral undulations corresponding to the sound-waves.

Second. Coating the tablet with a conducting material.

Third. Forming a matrix thereon by electrolysis.

Fourth. Separating the matrix from the original record-disk without the use of heat and pressing it into a tablet of suitable material to form the ultimate commercial record. It will be observed that the patent relates to disk and not cylindrical records, to soft and not hard recording materials, to record-grooves having lateral and not vertical undulations and to the multiplication of hard copies from the soft original and not a plurality of hard originals. Speaking broadly, it is these distinctions which separate the method of Jones from the prior art.

The patent has been bitterly contested but was sustained by this court in two causes, which were argued together, against the Universal Talking Machine Mfg. Company and the American Record Company, 151 Fed. 595, 81 C. C. A. 139. Upon a record presenting, we think, the essential facts upon which defendants rely as fully as in the case at bar, the court, after considering the prior achievements of Young, Bell & Tainter, Berliner and Edison said:

"It is shown that it did not occur to any one before Jones that the old use of the varying depth process on cylindrical records could be adapted to a new use with a uniform depth process on flat records with a useful and practical result. * * * The disk produced by the patented process responds to the test of success where others have failed. But, in addition to this inventive success, it is also a commercial success."

It is hardly necessary to say that unless the present record discloses new facts which materially change the issues involved we cannot alter our former decision; every question there determined is stare decisis. Even patent litigation must end somewhere.

The Circuit Court decided that the patent was anticipated by the Adams-Randall British patent, No. 9,996 of July 10, 1888. The court also decided that the first method admitted by the defendants, viz.: "Copying, or reproducing and multiplying by familiar electro-metallurgical process, records bought in foreign countries and lawfully imported into the United States" did not constitute infringement but that disks made by the second method adopted by the defendants did infringe. It may, perhaps, be urged that the finding of infringement, in view of the decision that the patent is invalid, was obiter, but we anticipate this objection by saying that we are satisfied that the judge of the Circuit Court was correct in holding that the method adopted by the defendants in the manufacture of their so-called "gold records" constitutes infringement and we deem it unnecessary to add to what he has said on that subject.

The only debatable question, therefore, left for decision is whether or not the Jones patent is anticipated by the Adams-Randall disclosures. In his provisional specification Adams-Randall states that the invention consists:

"Fourthly: In forming in a solid resisting material, such as lead, zinc, copper, wood, ivory, hard rubber, or similar materials, a channel or groove

of uniform depth preferably, the side or sides. of which represent a phonautographic record or phonogram.

"Fifthly: In forming in a semiresisting material like wax, paraffin or similar materials, or compounds, a groove or channel preferably, of uniform depth, the side or sides having formed therein, a phonautographic record or phonautogram.

"Sixthly: In producing such or similar record, in a solid resisting material, like lead, or semiresisting material like wax, and electroplating or obtaining electrotypes therefrom, in nickel, platinum, aluminum, phosphorbronze, or like material for the purpose of procuring a permanent and durable record."

In his complete specification he states the invention to consist:

"Fifthly,—In forming in a semiresisting material like wax, paraffin, or other like compound, by means operative independently of the primary vibrator, but acting in unison therewith, a groove, cut, or channel, which represents a phonautographic record or phonautogram.

"Sixthly,—In obtaining two or more phonautographic records simultaneously.

"Seventhly,—In obtaining a phonautographic record, directly in a solid resisting material like lead, wood or similar materials, and electroplating, or obtaining electroplates from the same, in nickel, platinum or like materials, for the purpose of obtaining durable records in duplicates."

The seventh claim is as follows:

"The method of making a durable phonautographic record of sound vibrations, which consists in cutting the record in solid resisting material such as wood, lead, etc., and then electroplating the same with copper, nickel or other tenacious metal, substantially as described."

Can it be said that all this describes the Jones invention in such full, clear and concise terms as to enable a person skilled in the art to produce a commercial sound-record by the Jones method? We think not, and this conclusion is confirmed by an examination of the drawings and other portions of the Adams-Randall patent.

It may be conceded that when Adams-Randall wrote the language quoted he was possessed of an idea of some kind, but neither an idea nor a thought is patentable, and neither can anticipate a patent. Assuming the existence of the idea, what was it, how was it to be carried out, and what was the result produced? The patent fails to answer with any degree of definiteness. A valid patent should not be destroyed by a vague, confused, indeterminate document.

If to-day a skilled artisan, who had never heard of the Jones or Adams-Randall patents, were given a Jones disk and the Adams-Randall patent and directed, after reading the patent, to construct similar disks, we doubt whether, even with such information, he would be able to do so. It must be remembered that the English patent was granted in 1888, nine years before the Jones application, and in the interval Bell, Tainter, Berliner, Edison and many other accomplished inventors were striving to produce commercial record-disks, but it never occurred to any of them, not even to Adams-Randall himself, to follow what is now said to be the obvious direction of the Adams-Randall patent.

Is not the fact that the patent was never heard of until it was resurrected for the purpose of this litigation, persuasive evidence that it contained nothing of value to the art? It deals with cylindrical, laterally grooved sound-records made by a revolving cutter or burr vi-

brating in hard material, so hard indeed that sound, it is said, can be reproduced from the originals. The patent does not suggest the use of the electro-plate matrix as a die but provides for coating the cylinder with copper, nickel or other tenacious metal to make it durable.

In short, we are unable to see that Adams-Randall's contribution to the art advanced it a single step. His patents abound in tentative, indeterminate and infeasible suggestions too nebulous to anticipate a patent which has actually shown the art how to make the thing needed. In contemplation of law an invention does not exist until the inventor's ideas have been reduced to practical form. As was said in Standard Cartridge Co. v. Peters Co., 77 Fed. 630, 645, 23 C. C. A. 367, 381:

> "The mere existence of an intellectual notion that a certain thing could be done, and, if done, might be a practical utility, does not furnish a basis for a patent, or estop others from developing practically the same idea."

The burden of proving anticipation by clear and convincing evidence rests heavily upon the defendants. We cannot avoid the conclusion that the sanguine and optimistic view taken by the defendants of the Adams-Randall patents is not justified by anything found in the patents themselves. The patent upon which the chief reliance is placed fails to give a clear statement of the method of producing the Jones disk. The naked assertion that a certain result has been accomplished without stating how, without describing the means which produce the result is insufficient as an anticipation. Hanifen v. Godshalk Co., 84 Fed. 649, 28 C. C. A. 507.

The most favorable view for the defendants is that the question of anticipation by the Adams-Randall patents is involved in doubt, and this is fatal to their contention. "If the process pursued for its development failed to reach the point of consummation, it cannot avail to defeat a patent founded upon a discovery or invention which was completed. * * * The law requires not conjecture but certainty." Coffin v. Ogden, 18 Wall. 120–124, 21 L. Ed. 821; Badische v. Kalle, 104 Fed. 802, 44 C. C. A. 201.

It is unnecessary to discuss the other alleged anticipating patents and articles said to appear for the first time in the present record. They add nothing of importance to the controversy. In other words if the references discussed by this court upon the former appeal plus the Adams-Randall patents are insufficient to destroy the patent in suit it is manifest that the alleged new references are equally ineffectual.

As before stated we hold that the second method adopted by the defendants and admitted by them in their stipulation to have been practiced prior to the commencement of the suit constituted an infringement of the claims of the complainant's patent. It would seem that nothing further is required. Where a patent has been declared valid and infringed a decree follows as a matter of course. As the Circuit Court has twice decided, once on a motion for a preliminary injunction, as we understand it (155 Fed. 427), and again at final hearing, that the first process employed by the defendants does not infringe, we should hesitate long before reaching a different conclusion. It is, however, for present purposes sufficient to say that the com-

plainant's proofs and the defendants' stipulation as to their second process amply sustain the charge of infringement.

The decree is reversed with costs of this court and the cause is remanded to the Circuit Court with instructions to enter the usual decree in favor of the complainant.