## HARTFORD EMPIRE CO. v. OBEAR NESTER GLASS CO. et al.

### No. 8524.

District Court, E. D. Missouri, E. D.

Feb. 24, 1931.

Dorsey & Cole, of Washington, D. C. (John H. Bruninga, of St. Louis, Mo., Wm. J. Belknap, of Detroit, Mich., A. C. Paul, of Minneapolis, Minn., and R. D. Brown, of Hartford, Conn., of counsel), for plaintiff.

Rippey & Kingsland, of St. Louis, Mo. (E. W. McCallister, of Pittsburgh, Pa., and Edw. E. Longan and John H. Cassidy, both of St. Louis, Mo., of counsel), for defendants.

DAVIS, District Judge.

The plaintiff, a corporation of the state of Delaware, is engaged in the business of manufacturing glass-working machinery which it customarily installs on a royalty basis in plants engaged in the business of manufacturing glassware. The corporate defendant, a corporation organized under the laws of the state of Missouri, is engaged in the business of manufacturing glass products of various kinds. The individual defendant, a citizen of Missouri, is employed by the other defendant.

This is an action for the alleged infringement of the following patents owned by the plaintiff: Patent No. 1,405,936, granted to Karl E. Peiler, February 7, 1922, application filed July 17, 1920; patent No. 1,662,436, granted to Karl E. Peiler, March 13, 1928, application filed July 17, 1920; patent No. 1,662,437, granted to Karl E. Peiler March 13, 1928, application filed July 28, 1920; and patent No. 1,677,436, granted to Enoch T. Ferngren, July 17, 1928, application filed September 29, 1913, renewed February 10, 1919. On the first of the above patents claims 1, 2, 3, and 4 are relied on; on the second of the above patents, claims 2, 4, 14, 21, 24, 25, 26, 27, 31, 33, and 36 are relied on; on

the third of the above patents, claims 24, 26, and 31 are alleged to have been infringed; on the fourth of the above patents, claim 22 is in issue.

The defenses interposed are invalidity, double patenting, and noninfringement.

All of the patents in suit relate to apparatus for feeding molten glass. It is the usual practice in this art to reduce glass to a molten form in a melting furnace, and then to cause the glass to pass into a forehearth from which a quantity of the mass sufficient for the manufacture of the particular article desired is delivered to a mold. The devices under consideration are designed to separate and deliver from the forehearth through an orifice in the bottom, a suitable charge of glass in a form capable of being received by the mold, which revolves or otherwise moves beneath the orifice.

Molten glass at temperatures at which it can be efficiently worked is a stiff viscous fluid which has a tendency to adhere to any hot material. In this form as it passes from the orifice at the bottom of the forehearth its tendency is to adhere to the sides of the orifice and allow the center of the mass to pull downward, and thereby form a small stream or thread. At the lower end of this stream glass forms in a larger mass and thus gives a "tadpole" appearance to the discharge. Molten glass is readily affected by the atmosphere which comes in contact with it, so that the outer area of the mass forms a sort of skin or enamel, while the inner portion of the glass remains unaffected. A charge of glass thus delivered to a mold cannot be efficiently converted to a commercial article because it is not in a uniform molten condition. Glass-feeding devices are, in the main, designed to feed the molten glass from the forehearth in a gob; that is, in a gather of more or less uniform diameter. A gob, mass, charge, as it is variously designated, of desired size, is forced out of the orifice and while in suspension, a knife or shears located underneath the forehearth severs the mass and allows it to drop into the mold.

General Description—Peiler Patents.

The machines described in the three Peiler patents are in many respects substantially identical, so that a general description covering all will be made, supplemented by a description of the construction and operation of the pressure and vacuum relief valves which are peculiar to each device.

The Peiler patents all relate to pneumatic feeders equipped with an air bell, the lower end of which is submerged in molten glass in a forehearth, and from which charges of glass are driven by intermittent pulsations.

The Peiler patents all disclose a pneumatic feeder in which an air bell is placed in a forehearth containing molten glass, the lower end of the bell being submerged and directly over an orifice in the bottom of the forehearth, from which charges of glass are driven by intermittent pulsations in the bell, and in which the suspended charge or gather is severed by shears. The glass flows to the forehearth from a melting furnace, and maintains the same level in both compartments. The glass in the forehearth completely covers the orifice at the bottom and passes freely between the lower end of the air bell and the orifice. The air bell is stationary in normal operation but is capable of being raised or lowered by adjustments. The air bell at its top is connected by a pipe through which compression, atmosphere, and vacuum are supplied in operation. Compression sends the charge out the orifice, the shears sever it in suspension, the vacuum is applied to draw back the stub, then atmosphere restored in the bell permits the flow of glass by gravity toward the orifice to form another charge. Consequently, it is said that these are all three-pressure feeders.

Description of the Construction and Operation of the Pressure and Vacuum Relief Valves of Peiler Patent, No. 1,405,936.

For the purpose of independently relieving the pressure in the air bell and thus adjusting the duration of each pressure, the air conduit 57–58 is connected into two valves 61 and 62 by branch pipes 59 and 60 (page 3, line 25 et seq.).

The valves 61 and 62 are alike; one to release pressure and the other vacuum (page 3, line 38 et seq.).

Each valve consists of a cylindrical casing 77. A reciprocating plunger is fitted in the casing and has a passageway therethrough. The valve casing has an opening on each side, one opening connecting with the branch pipe and the other opening to the atmosphere through a throttle valve 76. The valves are arranged side by side and fixed to the frame of the machine, the axes of the cylindrical casings being at right angles to the main operating shaft 22 of the machine.

When the openings in the casing and the passage through the plunger are in alinement, the valve is open, and when the plung-

er passage moves out of alinement with the openings in the valve casing, the valves are closed.

Each plunger is connected at its forward end to a lever 66, the lever being fulcrumed intermediate its length to a bracket formed as a part of the casing 77. The lever has a roller 67 at its upper end and a spring 68 is attached to the lever below its fulcrum, which spring tends to move the plunger inwardly, in which position the passage in the plunger is out of alinement with the passages in the valve casing and the valve is therefore closed.

Each roller 67 co-operates with a cam 63 or 64, whereby the lever is moved in and out to open and close the respective valves. When the high side of the cam contacts with the roller, the lever is moved to actuate the plunger to open the valve.

In order to adjust the cam, that is to change its angularity to cause the valve to open at a different point in the cycle of the cam, the cam is loosely mounted on the main operating shaft 22. The cam is rigidly connected with a bevel gear 69. The bevel gear 69 meshes with a bevel pinion 70 loosely mounted on a stud that projects upwardly from a collar 71, which collar is loosely mounted on the shaft 22. The bevel pinion 70 in turn meshes with a bevel gear 72 which is fixed to the shaft 22. As the bevel gear 72 rotates with the main shaft 22, it drives the pinion 70, the pinion 70 in turn driving the bevel gear 69 and thereby rotating the cam in the direction opposite to the direction of rotation of the bevel gear 72. In order to adjust the angular relation of the gears 69 and 72, the collar 71 is made adjustable. Thus, for this purpose, the collar 71 has a segmental gear 73 on its under face. This segmental gear meshes with a worm gear 74, which is on a stud shaft that projects to the front of the frame of the machine. The worm gear 74 is rotated by a hand wheel 87. When the worm gear is rotated by the hand wheel, the worm gear operating in the segmental gear turns the collar 71 circumferentially of the shaft 22, and thereby the angle of the cam in respect to the fixed gear is changed. Thus, the cams may be positioned to open the air system to the atmosphere at any desired time and thereby adjust the duration of the air pressure or vacuum, and by adjusting the throttle valve 76, the rate at which normal pressure is restored may be adjusted.

The pressure relief valves of the first Peiler patent are of the slide valve type, in which the slide is normally actuated by a spring to a position to close the valve. The valves are actuated to an open adjustment by cams which are driven from the main shaft of the machine by a train of differential gearing. The gearing includes a manually settable device for each valve which may be adjusted while the machine is in operation to independently change the angular adjustment of the cams in respect of the driving gears that are fixed on and rotate with the main operating shaft. Thus the time that the valves are actuated to open position may be independently adjusted.

Description of the Construction and Operation of the Pressure and Vacuum Relief Valves of Peiler Patent, No. 1,662,436.

For the purpose of controlling the pressure in the air bell, the air bell is connected by a pipe 46 with a horizontal pipe 47, said pipe 47 having three branch pipes leading respectively to three valves, one a vacuum controlling valve, one a relief valve to atmosphere, and one a pressure valve connected with a supply of compressed air. The three valves and their actuating means are identical in construction (page 3, line 20 et seq.). Each valve includes a cylinder in which is mounted a sliding plunger 52. The axis of the valve extends at right angle to the axis of the main operating shaft 22 of the machine. The valve plunger is provided with an opening 53 adapted to be brought into alinement with two holes on opposite sides of the cylinder member. One of these holes communicates with the pipe leading to the bell and the other is connected with a source of compressed air or vacuum or atmosphere. A latch device in the bottom of the cylinder yieldingly holds the plunger either in a position to maintain the valve open or to maintain the valve closed.

In order that the time of occurrence and duration of any pressure may be adjusted, each valve is actuated by two separate and relatively adjustable cams, one to open the valve and the other to close it.

Each plunger 52 is moved by a lever 62 mounted on a bracket 51 and has a slotted lower end which engages a pin 63 on the plunger. Each lever on opposite sides of its fulcrum carries two levers 64 and 65. These levers co-operate with the pair of cams 66 and 67. The high face of one of the cams moves the valve to open position and the high face of the other cam moves the valve to closed position.

The mechanism for driving the cams and

independently adjusting them is the same as the adjusting mechanism described in connection with patent No. 1,405,938.

The second Peiler patent has but one effective pressure relief valve. This valve is of the same type and construction as the relief valves of the first patent. The means for actuating the valve differs slightly from the valve actuating means of the first patent, in that it is positively operated to open and close adjustments by a pair of cams that are adjusted independently of each other by a manually settable device of the same construction as that employed in the first patent.

### Description of the Construction and Operation of the Pressure and Vacuum Relief Valves of Peiler Patent, No. 1,662,437.

The pressure and vacuum is created by a reciprocation of a piston pump in a cylinder. On the end of the cylinder two pipes are projected, the pipes joining a pipe that leads to the air bell. These pipes are numbered 54 and 57. The pipe 54 has a check valve 55 therein that permits the passage of air in the direction of the cylinder and the pipe 57 has a check valve 58 therein that permits the passage of air out of the cylinder. Each of the pipes 54 and 57 is equipped with throttle valves 56 and 59, respectively, for adjusting the rate of the passage of air through the pipes.

The cylinder is provided on diametrically opposite sides with two series of longitudinally arranged pipes communicating with the interior of the cylinder. One series of pipes is indicated by the reference numeral 71 and the other series is indicated by the reference numeral 74. Each of the pipes 71 is equipped with a check valve 72 and a throttle valve 73. The check valves 72 are inwardly opening; that is, they permit passage of air to the cylinder. The rate at which the air is permitted to enter the cylinder is controlled by the setting of the throttle valves 73. Each of the pipes 74 is equipped with a check valve 75 and a throttle valve 76. The check valves 75 permit the escape of air from the cylinder but prevent air from entering the cylinder.

Considering the movement of the piston on the out or vacuum stroke, the pressure curve is controlled by the setting of the throttle valves. For example, the first three valves uncovered by the piston may remain closed, so that during this part of the stroke of the piston vacuum will be developed, the next two valves may be slightly opened and the continued movement of the piston will therefore not modify the degree of vacuum and the remaining valves may be left open, thus preventing the creation of further vacuum. The same manipulation is employed in respect to the valves 76 in controlling the plus-pressure curve, or any other combination of settings of the valves may be made to accurately control the sub-atmospheric pressure curve and the super-atmospheric pressure curve. The relief to atmosphere during the generation of each pressure is determined by the opening of selected ones of each of the series of valves.

The bell is also equipped with a separate pipe 60 provided with a vacuum release valve and a pressure release valve. These valves are set to open at a predetermined degree of vacuum and a predetermined degree of pressure and are numbered on the drawing 61 and 62.

The extent and duration of pressure is therefore controlled as to plus-pressure by the setting of the valves 76 and the duration and extent of vacuum is controlled by the setting of the valves 73. The relief of plus and minus pressure above a predetermined degree is determined by the setting of the valves 62 and 61.

The third Peiler patent controls the relief of pressure by two series of pipes connected directly into the pump cylinder. One series relieves pressure and the other vacuum. By the interposition of check valves in the pipes of each series, the passage of compressed or rarified air from the pump cylinder is prevented except during the respective pressure and vacuum strokes of the piston. The relief of pressure or vacuum during successive points in the piston stroke may be optionally controlled while the machine is in operation by opening selected throttle valves in the pipes. Thus, at any selected point in the pressure stroke of the piston, the pressure may be relieved and, likewise, at any selected point in the vacuum stroke, vacuum may be relieved.

### Description of Ferngren Patent.

The Ferngren patent, the application for which dates back to 1913, is also a pneumatic feeder of the air bell type for feeding molten glass through a submerged orifice in intermittent pulsations. The arrangement of the air bell with the lower end submerged in molten glass over an opening for the discharge is not greatly unlike the Peiler devices. Provision is likewise made for admission of compressed air and vacuum at the top of the bell.

The bell, however, moves up and down with each operation. The discharge opening is different, being of funnel shape, described as a nozzle, and at the bottom comes in sealing contact with a cup, into which the discharge is drawn and the cup is then inverted and the molten glass is dropped into a mold. The structure and operation is again peculiar, in that there is provision made for admitting vacuum into the cup, while it is in sealing relation with the opening in the forehearth. Vacuum is applied to the cup at the same time compression is supplied to the bell, and the discharge is thus sucked into this container.

The air bell comes down at a time when suction is applied to the bell and a charge of glass is segregated and entrapped when the bell comes in contact with the top of the funnel or nozzle. When the cup comes in sealing relation with the bottom of the funnel, compression may be applied to bell, but vacuum must be applied to the cup and the charge of glass sucked from the funnel to the cup. Vacuum is withdrawn from the cup and compression from the bell at the time the cup moves away, and the bell makes its upward movement while the shearing knife momentarily closes the outlet, until bell is again lowered and vacuum applied. The patentee says that vacuuum in the bell may be dispensed with "except in cases where the glass is at such a high temperature as to flow very freely. The operation of suction through the base of the feed cup is important, however, aside from its mechanical action in affecting the discharge of glass, for it removes substantially all the air from the cup and thereby avoids the production of air bubbles in the glass charge" (page 3, lines 30 to 38).

Description of Defendants' Construction.

The general description above given of the three Peiler glass-feeding devices substantially covers the defendants' apparatus, with the exception of the valve system, and need not therefore be repeated. The structure is fully disclosed in defendant Stuckey's patent 1,686,109, October 2, 1928, application filed May 5, 1926. A statement of the valve mechanism of this structure, however, seems to be necessary.

Operation and Construction of Piston Valves of Defendants' Structure.

In defendants' structure, pressure and vacuum is created by the reciprocation of a pump piston. In the piston are two poppet valves, each having a valve body seating against a valve seat on opposite faces of the piston. Each valve has a valve stem, said valve stems extending in opposite directions. Each valve is operated to closed position by a spring. On the upper or pressure stroke of the piston, the valve stem of one of the poppet valves abuts against the cylinder head and opens the valve. As the piston moves away from the cylinder head, the valve is closed by the spring. A rod extends in alinement with the valve stem of the other poppet valve, and, when the piston reaches the end of its out stroke, the rod contacts with the valve stem, unseating the valve to open it. When the piston moves in the opposite direction, the spring closes the valve. The respective valves open alternately when the piston reaches the end of its in stroke and the end of its out stroke.

The valves remain in a set position, so that in the operation of the pump, the movement of the valve always takes place at the end of the stroke of the piston and the valves are therefore nonadjustable.

In defendants' structure, the valves are a part of the piston. These valves are of the poppet type and are unseated by their stems making contact with an abutment at the end of each piston stroke, respectively. They are not accessible to the operator and, therefore, are nonadjustable. One of the valves opens at the completion of the pressure stroke, and one at the end of the vacuum stroke. Each valve is closed and held closed by a spring, when its stem is moved out of contact with the abutment by which it is unseated.

Construction of the Claims.

It is important to determine whether the Peiler patents are to be broadly construed and accorded a wide range of equivalents, or on the other hand, to be strictly interpreted with a narrow range of equivalents. In this connection several things are to be observed.

(1) The patents on their face show that they are for improvements, and that there were various machines then in common use in the glass-feeding practice which operated in much the same manner as the patented devices. The following statement is to be found in the specifications of all of the Peiler patents:

"This invention relates to apparatus for feeding molten glass to the devices by which it is to be further shaped, as by molding or blowing. More specifically, the invention relates to apparatus constructed and arranged to separate and deliver a series of masses of glass of suitable size and shape to serve as mold charges to be formed into glassware."

"Various machines have been provided for this purpose, in which the container for the molten glass is provided with a submerged outlet, and the flow and cessation of flow is caused by extruding and intruding impulses imparted to the glass in or near the outlet. In some of these machines, the impulses are produced by changes in the air pressure on the surface of the glass near the outlet; that is, the air above the outlet may be compressed above atmospheric pressure to cause extrusion of the glass, and reduced to a partial vacuum to cause a cessation of the extrusion, or in some cases, an intrusion of the extruded mass, or of the stub left after severance. The gather is suspended beneath the outlet, and shears are usually provided to sever the mold charge from the gather. In this way, a series of charges is formed of a size dependent in part on the pressures and their duration, of the application of the abnormal air pressures, and these charges are of uniform size and shape so long as all conditions remain constant."

The foregoing statement is amply supported by the prior art pleaded and introduced in evidence. It shows extensive development has been had in the glass-feeding art, numerous patents have been granted, and a gradual progress has been made over a long period of time. The inventor of the Peiler patents alone has been granted over two hundred patents in the glass-feeding art. The rule of construction to be applied in this situation is well established.

In Chicago & N. W. R. Co. v. Sayles, 97 U. S. 554, 556, 24 L. Ed. 1053, it is said: "If the advance towards the thing desired is gradual, and proceeds step by step, so that no one can claim the complete whole, then each is entitled only to the specific form of device which he produces, and every other inventor is entitled to his own specific form, so long as it differs from those of his competitors, and does not include theirs."

Again, in Anakin Lock Works v. Dillon Lock Works (C. C. A. 8) 292 F. 45, it was said: "The claims of a patent involving mere improvements, in view of the prior art, are to be narrowly construed and limited to the particular mechanism described, and a device which accomplishes the same result by means of different mechanism is not an 'infringement.'" See, also, Measuregraph Co. v. Grand Rapids Show Case Co. (C. C. A. 8) 29 F.(2d) 263, loc. cit. 269.

(2) The applications for these patents were filed in July, 1920. The Ferngren application, then long on file, was acquired by plaintiff about the same time. The first of the patents was granted in 1922, and the other three in 1928. The plaintiff is the largest manufacturer of glass producing machinery in the country. Yet it is stipulated and fully shown by the evidence that not one of the four patents in suit have at any time or place been in commercial use. In fact, the evidence did not show that a machine embodying the structure of any other patents had ever been built for even demonstration purposes. That no use is even contemplated was shown by the statement of the patentee of the Peiler patents that their complicated structure rendered their commercial use impractical. These are, therefore, clearly paper patents. Nonuse does not deprive the plaintiff of any thing clearly described by his invention, but it does, under the circumstances here present, prevent the broadening of the scope thereof, and require a strict construction of the claims. Westinghouse Elect. & Mfg. Co. v. Toledo, etc., Railroad Co. (C. C. A.) 172 F. 371; Dernell Potato Products Co. v. Snelling (C. C. A.) 38 F.(2d) 788; National Malleable Castings Co. v. Buckeye Malleable Iron & Coupler Co. et al. (C. C. A.) 171 F. 847.

(3) The second, third, and fourth patents in suit have a long and comprehensive history in the Patent Office. The applicant on rejection of the applications amended, modified, and qualified the claims. Consequently, these patents are defined and limited by the terms upon which they were granted and accepted by the patentees. Wood v. Boylan (C. C. A. 8) 19 F.(2d) 48; Lorraine v. Townsend (C. C. A.) 290 F. 54.

### The Prior Glass-Feeding Art.

In the prior art there were many pneumatic pressure glass-feeders as well as others of the plunger type of which no notice need be taken. Plaintiff's Exhibit 33 contains a list of several patents covering such devices, and the patents were offered in evidence by defendants. The use of at least two pressures, vacuum and compression, to feed glass from an orifice is shown in McCauley 1,281,083, 1,322,318, Howard 1,315,668, Howard application 1917, Hitchcock 13,929, 805,068. The use of vacuum and atmosphere is likewise to be observed in the above-mentioned McCauley patent as well as in his patent 1,322,318 and his British patents. But plaintiff takes the position that the Peiler patents were the first disclosure of three controllable pressures in feeding molten glass. That is,

that Peiler for the first time made available normal atmospheric pressure of appreciable duration in a device designed for this purpose.

It is apparent, of course, that when compression and vacuum are used that it is impossible to revert from one to the other without resorting for a more or less distinct period of atmospheric pressure. But the advance that Peiler is conceived to have made is that he used atmospheric pressure for an appreciable and determinable period to permit glass to start a gravity flow toward the orifice. The controversy centering around this point presented a much discussed issue in this case.

A machine constructed according to the Hitchcock patent as defendant asserts, and as plaintiff denies, was exhibited at the trial. This patent discloses a pneumatic suspension charge feeder with a chamber not of air bell type. It is equipped with a flexible diaphragm from which a pipe leads to the discharge chamber. The diaphragm is connected at its central point to an arm which in turn is connected to one end of a lever, whereby to shift the diaphragm in and out, creating vacuum and pressure in the chamber. By providing an adjustable amount of play in the connection between the end of the lever and the end of the arm, the atmospheric pressure is restored for a determinable time between vacuum and compression. The specifications recite that "the movement of the diaphragm can be regulated in any suitable manner." To this end the adjustment above spoken of may be used, and in addition the cam on the power shaft is available to hold the lever in a desired position for a definite period of time.

The specification further describes the process of a gravity flow of glass toward the orifice because of normal pressure on the glass near the outlet between the vacuum and compression strokes of the diaphragm. The testimony of the witness Schwartz on these points is convincing.

The Howard application of 1917 likewise discloses the use of three pressures in feeding glass. Now that he is identified in business with plaintiff, his testimony that he did not intend to indicate the use of atmospheric pressure at one stage of the process is not convincing that his application did not reveal it.

The patentee of the Peiler patents in 1923 in interference proceedings filed certain disclaimers in which he said he was not the inventor of "the method of forming a mass of molten glass that comprises causing glass to flow by gravity through an opening and then applying an impulse to the flowing glass while the glass is hanging freely below said opening, said impulses continuing for a substantial period of time."

So Peiler was not the inventor of the use of any one or more of the three pressures concerning which so much has been said in this case. It is also our judgment that the prior art patents disclose the use of the three pressures for periods of appreciable duration. The patentee by his attitude before the department has recognized this to be the fact. Now, however, plaintiff disregards the injunction against "reaping where thou hast not sown, gathering where thou didst not scatter," and claims for itself this whole process.

The significance of attaining atmospheric pressure of appreciable duration in the bell has been greatly overemphasized in this case. The uncontradicted evidence is that in operation defendants' feeder worked as well without the valves to restore atmosphere to bell as with them. There is always normal pressure in forehearth and that is calculated to cause gravity flow at the orifice regardless of pressure condition in the bell. There may even be vacuum in the bell and still there will be gravity flow of glass around the lower end of the bell.

The use of valves to release pressure was old in the art. Severin 984,974. McCauley, 1,281,083, 1,322,318. It is not necessary to say that the use of a pump to supply compression and vacuum was common.

### The Test of Infringement.

The rule to be applied to determine whether or not a device infringes has been stated in Electric Protection Co. v. American, etc., Co. (C. C. A. 8) 184 F. 916, 923, as follows: "To sustain the charge of infringement the infringing device must be substantially identical with the one alleged to be infringed in (1) the result attained; (2) the means of attaining that result; and (3) the manner in which its different parts operate and co-operate to produce that result. If the devices are substantially different in either of these respects the charge of infringement is not sustained. [Citing cases.] In determining the question of infringement of a patent for a combination, it is therefore necessary to look at the mode of operation or the way the device works, as well as at the result and the means by which that result is at-

tained." Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935. See, also, McDonough v. Johnson-Wentworth Co. (C. C. A. 8) 30 F.(2d) 375. With this test in mind attention is directed to the veritable plague of claims in issue in this case.

### Claims 1 to 4, Inclusive, of the First Peiler Patent.

■ Plaintiff in its brief has treated claim 4 as covering the subject-matter of all of these claims so it may be taken as typical. It reads: "In an apparatus for separating molten glass into mold charges, the combination of a glass container having a submerged outlet, an air pump, a conduit to transmit air pressure from the pump to the surface of the glass, means for actuating the pump to produce alternate compression and vacuum, valves to open the conduit to the atmosphere and means for actuating a valve in timed relation with each pressure."

Plaintiff states that the essence of this claim is that it discloses "a pump for creating glass-controlling vacuum and pressure upon the glass over the submerged orifice, and valve means for restoring, for a substantial period of time, glass-controlling atmospheric pressure upon the glass over the submerged orifice."

The claim must be read in the light of the drawings and other portions of the specifications. The means for supplying compression and vacuum and restoring atmosphere are those disclosed. If the patented structure is compared with defendants' structure, the following differences will be observed:

### Differences between Peiler's Structure and Defendants'.

The adjustments of a cam in first Peiler patent permit a variance of the speed of the piston during the same stroke.

In defendants' apparatus when air is impressed upon piston of air motor it moves at a definite and constant speed throughout the stroke.

In/Peiler devices there can be effected a change in the beginning and end of the stroke of the piston while the machine is in operation.

In defendants' machine to adjust piston it is necessary to stop the operation and change the cam which determines the length of stroke of piston.

In Peiler device the valves are independently adjustable, so that a resort to air can be had regardless of the position of the piston.

In defendants' feeder the valves are only opened at the end of the stroke when the piston contacts the cylinder, and are not capable of being otherwise operated.

In Peiler patent, throttle valves on air line are independently adjustable so that you can change vacuum or compression quickly or slowly as desired.

In defendants' device no such adjustment is possible; the valves are either open or closed.

In Peiler there is branch air line on which valves are placed.

In defendants' structure air line leads from pump directly to air bell.

The following features are common to all the Peiler patents and are stated here to avoid repetition:

The valves are independently adjustable so that resort to compression, vacuum, and atmosphere in varying degrees can be had at any time and for any duration desired.

In defendants' feeder there is no such adjustment possible.

In operation Peiler is enabled to impart different pressures at different instances during the formation of a single gather of glass.

In defendants' structure there is no shaping of the gather by varying the rate of discharge of molten glass to successive portions of the gather. The rate is constant and not subject to alteration.

Are these last-named features of any consequence? The patentee answers the question in the specifications to each of the Peiler patents (paragraphing is ours):

(1) "It is of great advantage to have the gather shaped to conform to some extent to the shape of the mold in which the charge is to be received, and it has been discovered that the shape of the gather can be controlled by varying the rate of discharge of the molten glass to successive portions of the gather."

(2) "By this method an increase in the rate of discharge increases the diameter of that portion of the gather to which it is delivered, and, conversely, a decrease in the rate reduces the diameter of a corresponding part of the gather."

(3) "If a uniform rate of discharge is maintained to all parts of the gather, it assumes a pear shape with an attenuated neck of the same general shape as is produced by a constant gravity discharge, which is the usual shape well known in the art."

(4) "Furthermore, in order to maintain

any particular size or shape of gather, it is desirable that the several parts and forces acting to form the gather shall be capable of delicate relative adjustment so as to permit variation in other working conditions, such as the fluidity of the glass, which are not easily controlled."

(5) "The object of the present invention is to provide an apparatus which will form and deliver a series of uniform mold charges of various sizes and shapes, to suit the particular wares being manufactured."

(6) "The features of the invention reside in such an apparatus having provision for relative adjustment of the several forces acting together to form the gather."

(7) "The impulses acting to form and shape the gather are produced by variation in the air pressure which controls the rate of discharge of the glass, and, therefore, means is provided for varying the air pressure from a condition approaching a vacuum to normal atmospheric pressure and to a condition of compression higher than atmospheric pressure."

(8) "Means is also provided to permit independent adjustment of the duration of various air pressures."

(9) "By a proper adjustment of the time and amount of these pressures, mold charges of any desired shape and size may be produced, and slight adjustments may be made to counteract otherwise uncontrollable changes in conditions involved, and uniformity in the desired shape and size of the charges may be maintained."

This statement from the patents themselves (it is to be found in all the Peiler grants) makes it clear that it is desirable to produce a charge of glass in such a size and shape that it can be utilized in the mold; that a uniform pressure throughout the delivery of the charge does not accomplish the desired result; that the patents solve this problem, and herein resides the invention, by providing an apparatus capable of being adjusted to vary the duration, time, and amount of these pressures to the end that a charge of proper size and shape may be delivered to the mold. It is the theory of all of the Peiler patents that by the means provided the various pressures may be so adjusted, controlled, and manipulated that the suspended gather may be caused to take any particular size and shape that is desired. This is accomplished as the patents further set out by a system of relief and throttle valves the operation of which is minutely described in the patent. Here is stated the essence of the invention in language which from the point of view of clarity leaves nothing to be desired.

The defendants' feeder does not produce the same result and does not operate in the same manner. The claims under consideration are not infringed.

### Claims 2, 4, 14, 21, 24, 25, 26, 27, 31, 33, and 36 of the Second Peiler Patent.

In the second Peiler patent in suit claims 2, 4, 14, 21, 31, and 33 cover an apparatus for feeding glass. Claims 24, 25, 26, 27, and 36 cover a method of feeding glass. Claims 2 and 33 may be taken as typical of the apparatus, and claim 26 may be regarded as a sample of the method.

"2. The combination of a molten glass container having a submerged outlet, and means to periodically apply pneumatic pressure above atmospheric pressure on the glass in the container, to reduce said pressure below atmospheric pressure and to return the pressure to normal atmospheric pressure, during substantial periods of time in each cycle of operations of said means, whereby the glass issues from the container under normal atmospheric pressure for a definite period and under superatmospheric pressure for a definite period, and whereby the issue of glass is retarded during the definite period of reduced pressure."

"33. The combination of a receptacle to contain molten glass, said receptacle having an opening in the bottom thereof, a cylinder open at its lower end projecting downward beneath the surface of the glass over said opening, automatic means to vary the pressure within the cylinder, said cylinder having a normally fixed position permitting the passage of the surrounding glass to said opening, and means whereby the cylinder may be adjusted into position to cut off communication between said opening and the glass surrounding the cylinder."

"26. The method of separating a mass of molten glass in a container having a submerged outlet, into mold charges, which includes the steps of exposing the surface of the glass over the outlet to a pressure above atmospheric, a pressure below atmospheric, and an intermediate pressure, all three pressures being of substantial duration."

Plaintiff summarizes these claims by asserting that they provide: "Apparatus for applying three distinct and substantial glass-controlling pressures to the glass over the

submerged orifice. The method of using three distinct and substantial glass-controlling pressures for feeding glass out of a submerged orifice. A normally stationary bell for regulating, by its height, the flow of glass to the submerged orifice, and adapted to be lowered when the feeder is stopped to shut off the supply of glass to the orifice.

What was said of the nature and purpose of the first Peiler patent is equally true in this instance. The two applications were filed on the same day. The statement of the object of device, the purpose to be obtained, and the manner of attaining the result are identical. This patent discloses three independent sources of atmosphere vacuum and compression, while the first patent disclosed one source, a pump, for all. Here again the peculiar result sought to be attained is brought about, at least in theory, by the complicated valve structure heretofore mentioned. Additional statements in the specifications emphasize the inventor's purpose. The "configuration of the gather may be still further varied by the rapidity with which the air pressure is changed, and an important factor in determining the shape of the gather is the relative time of application and duration of the various pressures to the glass." Page 2, lines 95 to 101.

Again the patentee says: "It will be observed that the time of starting, the time of stopping, the application of a new pressure and the rate at which any change in pressure is made, are all independently adjustable during the operating of the machine. By this construction it is possible to adjust the feeding machine so as to produce various shaped mold charges adapted to use in as many different shapes of molds. Moreover, by manipulation of the various adjusting devices during the operation of the machine, the shape and size of the charges may be kept uniform notwithstanding the slight changes in heat or other operating conditions, which usually produce slight variation in the charge." Page 5, lines 52 to 67.

The history of this patent as revealed by the file wrapper is interesting and instructive. After the claims of this patent had been repeatedly rejected in the department, the patentee filed, on February 9, 1928, the following statement: "The present applicant disclosed an invention substantially different from that claimed in patent No. 1,405,936, and discloses, as a practical embodiment thereof, an apparatus having means for applying three different pressures—super atmospheric, subatmospheric and an intermedi-

ate stabilizing or normal atmospheric pressure—to the glass above a submerged outlet of a glass container for substantial independently adjustable periods of time and also comprises separate valves for controlling the application of the three different pressures to the glass and separate independently adjustable means for opening and closing each of such valves, whereby the time of beginning and end of each impulse imparted to the glass may be independently adjusted."

Thus it is seen that in the effort to obtain this patent, covering a period of six years, the patentee planted his case on the proposition that the claims must be interpreted in view of the peculiar pressure producing and controlling mechanism as involved in the valve organization and operation of his device. He prevailed on this argument, for the patent was issued one month after the filing of the above statement. Still the plaintiff seeks to read the patent in the light of hope and desire, and not in view of accomplished reality.

Both the result and the manner of attaining it are distinguishable from defendants' feeder.

Claims 31 and 33 have the additional element that air bell may be lowered at the cessation of operation so as to stop the gravity flow from the orifice. These claims were not in original application, but appeared by amendment. There is no statement in the specifications that the bell is designed to be lower to close the opening, and, consequently, nothing to justify the claim.

Moreover, McCauley 1,281,083, October 8, 1918, shows a somewhat similar use of the tubular feed member. But in McCauley's British patent 114,583, the exact feature is described in these words (page 2, line 22), "The tubular feed member 19 is slidingly fitted in the upper part of the extension 2 as shown in Fig. 1, and it is normally held substantially in the position shown in Fig. 1, though the same may be raised or lowered according to the different circumstances, and as different quantities of glass are required, *when the cylinder or tubular feed member 19 is lowered for its full extent no glass will flow into nozzle 16.*"

These claims (31 and 33) are invalid because they are (1) broader than the disclosure of the patent, and (2) anticipated by the McCauley patents.

But if valid they are not infringed because infringement does not arise by the use of one element of a combination, but by the

employment of all of the elements of the combination or their equivalent. Measuregraph Co. v. Grand Rapids Show Case Co. (C. C. A. 8) 29 F.(2d) 263; Wichita Visible Gasoline Pump Co. v. Clear Vision Pump Co. (C. C. A. 8) 19 F.(2d) 435. This observation should be kept in mind in connection with all claims involved in this action. These two claims embody the other elements of plaintiff's patent which have been found not to be in defendants' structure. Consequently, the claims are not infringed.

The method claims contain no reference to the device by which the result is accomplished. No matter how the practice of glass feeding is carried on, if three pressures of appreciable duration are employed, these claims are infringed. Considering the state of the art, and the patentee's statements before the department, the position here taken by plaintiff is presumptuous. An "art," as that term is used in the statute, may in certain cases be the subject of a patent. But as the rule is understood when the "art" consists entirely of mechanical transactions, and which are only the peculiar functions of a machine constructed to perform them, no patentable subject-matter is presented. The substance of these claims is simply a restatement of the alleged normal operation of plaintiff's feeder, but there is a careful failure to mention or to refer to any device that carriers on the process. It is not possible to carries on the process. It is not possible to anything but the operation and effect of plaintiff's feeder. The claims must fall as covering a mere function. National Hollow Brake-Beam Co. v. Interchangeable Brake-Beam Co. (C. C. A. 8) 106 F. 693; Heidbrink v. McKesson (C. C. A.) 290 F. 665, 668; Hartford-Empire Co. v. Obear-Nester Glass Co. (C. C. A. 8) 39 F.(2d) 769; Busch v. Jones, 184 U. S. 607, 22 S. Ct. 511, 46 L. Ed. 707. As intimated above, the claims are vulnerable for other reasons.

### Claims 24, 26, and 31 of the Third Peiler Patent.

Claim 26 may be taken as typical, but it should be remembered that claim 24 has the additional element of restoring air pressure on the surface of the glass to normal when the machine is stopped.

"26. In apparatus for separating molten glass into mold charges, the combination of a container for the glass having a submerged outlet of a reciprocating pump comprising a fixed and movable member, relief means carried by one of said members and arranged to be opened or closed by the relative movement of said members to limit the duration of abnormal pressure, produced by the pump, and means connected to the pump for transmitting said abnormal pressure to the glass to aid in regulating movement of glass through the outlet and in imparting a predetermined artificial shape to the discharged glass suspended below the outlet."

Plaintiff summarizes these claims by stating that they provide:

"A pump for creating glass-controlling vacuum and pressure upon the glass over the submerged orifice, and valve means for restoring, for a substantial period of time, glass-controlling atmospheric pressure upon the glass over the submerged orifice, the said valve means being carried by one of the pump members and controlled by movement of the pump piston."

"The automatic restoring of atmospheric pressure upon the glass over the submerged orifice when the apparatus is stopped."

The machine disclosed by this patent, as has been said, is similar to that disclosed in the other two patents, and the pressures to the air bell are supplied by a pump as in the first patent. But it differs by having the valve construction connected to a pump member and operated by the movement of the pump piston. The appearance of the valves was described as resembling a pipe organ. There is little to be said about this patent, as the purpose and object of the inventor was stated in the same language that was in the other patents, and the application was filed about the same time. This object is here attained by a separate and distinct system of valves peculiar to this patent. The history of this patent in the department is similar to the previous patent. Here again the grant was obtained upon the theory that the pressure controlling mechanism was novel as embodied in this structure. The operation of this valve organization and operation has heretofore been mentioned in the description of the patent. With reference to the feature of restoring atmosphere to bell when operation ceases, it need only be said that plaintiff provides a structure that so operates regardless of the position of the piston of the pump. The result is inevitable. The defendants' machine does not embody this feature. Atmosphere may be restored only in the event that the piston stops at the very end of the stroke. The plaintiff is entitled to whatever of value there is in this construction, but is not enti-

tled to anything more. The whole construction, operation, and function is so decidedly different from that employed by defendant, that no infringement can be ascertained.

### Claim 22 of the Ferngren Patent.

█ Claim 22 of the Ferngren patent is in issue, and it reads as follows: "In an apparatus for separating molten glass into mold charges, the combination of a receptacle for the glass having a submerged outlet, a member within the receptacle having a chamber opening toward the outlet, and having its lower edge submerged in the glass, and automatic means operating in a predetermined order and time, for periodically creating a vacuum within the chamber to prevent the discharge of glass from the outlet, and for supplying compressed air to the chamber to discharge the glass from the outlet."

This claim first made its appearance in the application in January, 1921, eight years after it had been filed and after it was acquired by plaintiff. It was not supported by the oath of the inventor as required by the statute, Title 35 USCA § 35, and for that reason is attacked. The question raised is thus stated in Cleveland Gas Burner & Appliance Co. v. American Heating Corp. (C. C. A. 8) 38 F.(2d) 760, 763, "in case of amendment, either in the specification or claims, the question always is whether the matter presented by the amendment is new matter or merely a legitimate amplification of that contained in the application as originally verified and filed." Citing General Electric Co. v. Morgan-Gardner Electric Co. (C. C. A.) 168 F. 52, and other cases. Answering the question on the record here, there is a claim presented years after the application has been filed, not by the original inventor, but by plaintiff who has acquired it, and at a time when plaintiff is itself engaged in prosecuting numerous patent applications for similar devices including those in suit. The drawings and specifications originally filed disclosed a glass-feeding structure where the application of vacuum in the cup to draw or suck the charge from the opening of the forehearth was essential. It could not be worked any other way as the patentee expressly stated. No disclosure was made of a structure "for supplying compressed air to the chamber to discharge glass from the outlet." Since the patentee by his device could not carry out that process, it cannot be said that claim 22 is merely an amplification or clearer statement of something in the original application. It speaks in a language of a different period of the glass-feeding art. It is an "interloper," as Judge Van Valkenburgh said in the above-cited case. The claim is void because not supported by the statutory oath.

█ The whole structure and process as disclosed by Ferngren are so radically different from defendants' machine that analogy is almost impossible. The main point relied upon is that both use compression and vacuum to produce the discharge of the molten glass. But these are both used in Lott 1,382,994, application filed September 27, 1909, and Hitchcock 805,068, application filed June 13, 1904, as well as in other patents. The following features in Ferngren are wholly absent in defendants' feeder: The bell is not stationary during operation; the charge is segregated and entrapped by downward movement of the bell; the glass is not delivered in suspension but from the nozzle to a sealed cup; the application of vacuum or compression to the bell is not essential, but the use of suction in the cup is imperative.

The result, the means, and the manner of producing it are all different. There is no ground for charging infringement, even if the claim were valid.

█ The defense of double patenting has been asserted in this case. The plaintiff takes the position that the defendants' device infringes each of the three Peiler patents. If one structure infringes three other structures, that in itself lends some weight to the assertion that the three infringed devices are one and the same thing. The only possible way to avoid the charge of double patenting is to take the position that the patents in suit are not identical in their pressure valve organization and operation. Otherwise they are the same. The plaintiff's patents more nearly resemble each other than they resemble in structure and function defendants' feeder. The department after the long and careful consideration that it gave these applications evidently took this position. It considered that the claims should be strictly construed, and each patent entitled to a narrow range of equivalents. The patents cannot be differentiated any other way.

This view is also emphasized by the fact that notwithstanding the issuance of the Peiler patents, the defendant Stuckey was granted, in 1928, a patent on the glass-feeding machine alleged to be the infringing structure in this case. The granting of a patent to the defendant at the time that plaintiff's applications were pending strengthens the ordi-

nary presumption of the validity and is substantial indication that the subsequent patent does not infringe.

In Brammer v. Schroeder (C. C. A.) 106 F. 918, loc. cit. 928, Judge Sanborn speaking for the court said: "It is said that the subsequent patent to the appellant raises the presumption that his combination is new, and that it does not infringe that of the appellee; and this proposition may be conceded. Corning v. Burden, 15 How. 252, 271, 14 L. Ed. 683." See, also, Mayo Knitting Machine & Needle Co. v. Jenckes Mfg. Co. (C. C.) 121 F. 110, loc. cit. 125; Fore Electrical Mfg. Co. v. St. Louis Elect. Works (C. C. A. 8) 280 F. 49; Sander v. Rose (C. C. A. 8) 121 F. 835.

The defense of double patenting has not been sustained. No ruling seems necessary on the validity of the claims, except as has been heretofore indicated.

### Summary.

The conclusion is that claims 1, 2, 3, and 4 in Peiler patent 1,405,936, and claims 2, 4, 14, and 21 of Peiler patent 1,662,436, and claims 24, 26, and 31 of Peiler patent 1,662,-437, and claim 22 Ferngren patent 1,677,436, are not infringed; that said claim 22 is invalid; that claims 24, 25, 26, 27, 31, 33, and 36 of Peiler patent 1,662,436 are invalid, and that said claims 31 and 33 are not infringed.

A decree and suggested findings of fact and conclusions of law in compliance with Equity Rule 70½ (28 USCA § 723) in accordance with this opinion, may be tendered.